**PHILLIPS PETROLEUM COMPANY, Shell Oil Company, Northern Petrochemical Company, and El Paso Products Company, and Himont, U.S.A., Inc., Plaintiffs,**

v.

**UNITED STATES STEEL CORP., Hercules Incorporated and Phillips Petroleum Company, Defendants.**

Civ. A. Nos. 83–143, 83–148, 83–547, 83–801, 84–79 and 85–255 MMS.

United States District Court, D. Delaware.

July 24, 1985.

**336**

C. Waggaman Berl, Jr., Wilmington, Del. (Harry J. Roper, Sidney Neuman, George S. Bosy, Nicholas A. Poulos, and William P.

Oberhardt, Neuman, Williams, Anderson & Olson, Chicago, Ill., of counsel), for Phillips Petroleum Co. and Shell Oil Co.

Charles S. Crompton, Jr., Potter, Anderson & Corroon, Wilmington, Del. (Francis T. Carr, Kenneth E. Madsen, and James Galbraith, Kenyon & Kenyon, New York City, of counsel), for Northern Petrochemical Co., U.S. Steel Corp., Hercules Inc. and Himont, U.S.A., Inc.

Arthur G. Connolly, Jr., Connolly, Bove, Lodge & Hutz, Wilmington, Del. (Thomas F. Reddy, Jr., and Stanton T. Lawrence, III, Pennie & Edmonds, New York City, of counsel), for El Paso Products Co.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

With the October, 1985 trial date in the Phillips Petroleum Company ("Phillips") polypropylene litigation looming ahead, a new actor has appeared on the already crowded stage to play out the remaining scenes of the lawsuit. On April 30, 1985, Himont U.S.A., Inc. ("Himont") filed an action for declaratory judgment, averring that Phillips' U.S. Patent No. 4,376,851 ("the '851 patent") is invalid, unenforceable, and not infringed by Himont's activities. By order of this Court dated May 29, 1985, Himont's suit was consolidated for pre-trial purposes with five previously consolidated actions arising from the same patent. Himont, the holder of a non-exclusive license under the patent, now appears before the Court requesting a preliminary injunction to prevent Phillips from terminating its license.[1]

The license agreement, executed between Phillips and Hercules Incorporated and subsequently assigned by Hercules to Himont, permits the production of any product which is covered by the '851 patent in exchange for royalty payments to Phillips. The scope of the license is coextensive with the patent's single claim to "normally solid

---

1. Himont's motion, filed with the complaint, was styled as an "Application for a Temporary Restraining Order and An Order to Show Cause re Preliminary Injunction." (Dkt. 2). Argument was deferred to permit the parties to file briefs and affidavits. On May 29, 1985, a hearing was held and the parties were given ample time to fully present their views. The motion will be treated as a motion for preliminary injunction.

polypropylene, consisting essentially of recurring polypropylene units, having a substantial crystalline polypropylene content." The license is to remain in effect for the life of the patent, absent default by the licensee or failure to comply with any of the license terms.

Himont contends it has been paying royalties assiduously for its manufacture of the basic polypropylene homopolymer,[2] but has withheld royalties on certain copolymers because of what it terms a "bona fide dispute" with Phillips over whether these products are within the scope of the claim of the '851 patent.[3] Himont's refusal to pay on the disputed products has prompted Phillips to issue a notice of default on the license. According to the terms of the license agreement, if Himont fails to cure the "default" within a prescribed period, Phillips may, at its own option, terminate the entire agreement.[4] (Dkt. 3, Exh. B, ¶ 12.2). Himont therefore seeks preliminary relief to prevent Phillips from terminating the license while the dispute on the scope of the '851 patent is litigated.

■ The standard governing the grant of a preliminary injunction is well known. To obtain such equitable relief, the moving party must show both a strong probability of success on the merits of the litigation and that irreparable harm will result if the injunction is not granted. In addition, the Court should consider the possibility of harm to other interested persons from the grant or denial of relief as well as the public interest. *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1578–79 (Fed.Cir.), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983); *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120, 136 (3d Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).

In this case, whatever the likelihood of Himont's ultimate success on the merits of its claim, its inability to establish irreparable injury is fatal to its motion. Himont's claim of irreparable injury is essentially premised upon the Hobson's choice that now confronts it. Himont may ensure continuation of its license only by paying royalties on products arguably outside the scope of its license agreement. Should Himont prove correct in its interpretation of the patent, Phillips might enjoy a windfall at Himont's expense. If, on the other hand, Himont refuses to pay on the disputed products, it risks loss of the license as a whole, including its right to manufacture homopolymers of propylene at the license's favorable royalty rate.[5] Because of the magnitude of this risk, Himont argues, it is in effect coerced into paying Phillips "protection money" to safeguard its interests. Thus, it is the threatened

---

2. A homopolymer is a polymer derived from a single monomer, in this case propylene. *See The Condensed Chemical Dictionary* 535 (10th ed. 1981).

3. Himont manufactures two groups of products which are in dispute under the license agreement. The first is a random copolymer formed from propylene and ethylene. The ethylene content of these particular copolymers is less than five percent. The second group of products is what Himont calls impact grade polypropylene. This product, as Himont describes it, is a mixture of a polypropylene homopolymer, admittedly covered under the '851 patent and subject to royalties under the license agreement, and a propylene/ethylene copolymer containing from 50 to 70 percent ethylene. Phillips contends that the product is actually a "block copolymer" and not an impact grade polymer. A block copolymer as it relates to this case is a product formed by first polymerizing propylene

for a period of time, and then adding a given amount of ethylene to the reactor while continuing the polymerization process. The resulting compound contains a long sequence of a propylene polymer which is chemically bonded to a propylene/ethylene copolymer. Phillips seeks royalties for this product under both the '851 patent and U.S. Patent No. 3,970,719, which it also owns.

4. Himont initially had 60 days from the date of Phillips' March 7, 1985 notice to cure the purported default. That deadline was extended by stipulation of the parties to June 7, 1985. At oral argument, Phillips agreed it would not exercise its right to terminate the license pending this Court's decision on the preliminary injunction.

5. Himont contends that the negotiated market royalty rate is now six times the rate Himont is paying under its license. Dkt. 3 at 9.

loss of the license as a whole, despite substantial compliance with its terms, that Himont posits constitutes irreparable injury.

■ While Himont's argument has superficial appeal, I am not convinced that the risk of termination of its license constitutes irreparable harm. Undeniably, that risk exerts a powerful force over Himont's future actions. The Court's concern in granting equitable relief is not, however, with the influence that the risk of an erroneous decision exerts over Himont's conduct, but with the *actual* irreparable injury which would befall Himont pendente lite, even if it ultimately prevails in this litigation.

■ Analyzing the facts from this perspective, the Court need consider only two possible scenarios, both of which result in denial of Himont's motion. If Himont continues to withhold royalties on the disputed products and succeeds in its assertion that the products are not covered by Phillips' patent, there would be no breach of the license agreement and any termination of that agreement would be deemed ineffective. Indeed, Phillips has conceded as much in its brief and at oral argument. Thus, under this scenario, Himont would suffer no harm whatsoever. If, on the other hand, Himont yields to Phillips' demands and pays the contested royalties, its vindication on the merits may be less complete, for its ability to recoup the erroneously paid royalties is, under the current state of the law, uncertain.[6] Nevertheless, even an irrevocable monetary loss, barring some special or onerous hardship, presents insufficient justification for a preliminary injunction. *Coca-Cola Bottling Co. v. Coca-Cola*, 563 F.Supp. 1122, 1141 (D.Del. 1983). Himont has made no suggestion that its pecuniary loss would, for example, jeopardize its solvency or require substantial changes in company operations. Absent such specialized harm, Himont cannot succeed in establishing irreparable injury and accordingly does not satisfy the grounds for preliminary injunction.[7] *See Id.* at 1141; *see also A.O. Smith Corp. v. Federal Trade Commission*, 530 F.2d 515, 527–28 (3d Cir.1976); *Northern Natural Gas v. Department of Energy*, 464 F.Supp. 1145, 1158 (D.Del.1979).

■ Himont's motion does, however, raise a matter of some concern to the Court. A licensor may always attempt to exact royalties for that which lies at the fringes of the scope of its patent, safe in the knowledge it has nothing to lose and indeed has the promise of substantial gain. Where it is clear that the licensor has overstepped the limits of its patent, the licensee may refuse payment and secure reinstatement of the license upon successful litigation of the patent's scope. But where even a remote possibility exists that the scope of the patent claim is as expansive as the licensor asserts, a prudent licensee will often meet the licensor's demands rather than risk termination of an otherwise favorable agreement. The inherent potential for abuse of a license agreement is apparent. A judicially created remedy for this

---

**6.** In this district, it is settled that a licensee may not, absent special circumstances, recover royalties paid during the pendency of a successful attack on a patent's *validity*. *In re Cole Patent Litigation*, 558 F.Supp. 937, 961 (D.Del.1983), *aff'd in part and rev'd in part, RCA Corp. v. Applied Digital Data Systems Inc.*, 730 F.2d 1440 (Fed.Cir.), *cert. dismissed, Hazeltine Corp. v. RCA Corp.*, — U.S. —, 105 S.Ct. 32, 82 L.Ed.2d 923 (1984). Other jurisdictions have, however, expressly or impliedly approved of payment of royalties into an escrow account pending litigation. *See, e.g., Precision Shooting Equipment Co. v. Allen*, 646 F.2d 313, 321 (7th Cir.), *cert. denied*, 454 U.S. 964, 102 S.Ct. 503, 70 L.Ed.2d 379 (1981); *Atlas Chemical Industries, Inc. v. Moraine Products*, 509 F.2d 1 (6th Cir.

1974). Whether a licensee would be entitled to recovery of royalties where a patent is held valid but not infringed remains to be determined at such time as that issue is squarely before the Court.

**7.** There is, of course, a third scenario. Should Phillips terminate the license because of Himont's continued refusal to pay the disputed royalties, and should Himont be proven wrong on the merits of its dispute, it will be forced to negotiate a new license, presumably at a substantially higher rate. Such harm would, however, be occasioned by Himont's own mistaken business judgment, which cannot be a basis for a preliminary injunction.

type of abuse, if it should occur, must await the proper case.

An order will be entered denying Himont's motion for preliminary injunction.